# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

P&M CORPORATE FINANCE, LLC,

          Plaintiff,

v.

LAW OFFICES OF DAVID J. STERN, P.A.,
DAVID J. STERN, JOHN DOE Fraudulent
Transferees 1-50, DJSP ENTERPRISES, INC.,
DAL GROUP, LLC, DJS PROCESSING, LLC,
DAL HOLDING COMPANY-DS, PROFESSIONAL
TITLE AND ABSTRACT COMPANY OF
FLORIDA, LLC

          Defendants.

Hon. K. Michael Moore
Case No.: 15-CV-60736-KMM

_____/

## FIRST AMENDED COMPLAINT

Plaintiff P&M Corporate Finance, LLC ("PMCF") sues Defendants, Law Offices of David J. Stern, P.A. ("LODJS"), David J. Stern ("Stern") (together, the "Stern Defendants"), John Doe Fraudulent Transferees 1-50 (the "John Does"), DJSP Enterprises, Inc. f/k/a Chardan 2008 China Acquisition Corp. ("DJSP"), DAL Group, LLC ("DAL"), DJS Processing, LLC ("DJS"), DAL Holding Company-DS f/k/a DJS Servicing, LLC ("DSI"), and Professional Title and Abstract Company of Florida, LLC ("PTA LLC") (together, the "DJSP Defendants"), and states as follows:

## PRELIMINARY STATEMENT

1.     PMCF brings this action to recover, as damages, its costs and attorneys' fees from the Stern Defendants pursuant to a valid and enforceable contractual indemnification agreement. The Stern Defendants have expressly refused to satisfy that obligation, although timely demand was made.

2.      PMCF also brings this action to set aside various transfers PMCF believes, based upon information and belief, that LODJS made after PMCF made its demand for indemnity, and that those funds be used to honor the contractual obligations owing to PMCF.

3.      PMCF also brings this action to set aside a transfer PMCF believes, based upon information and belief, that the Stern Defendants made to the DJSP Defendants after PMCF made its demand for indemnity, and that those funds be used to honor the contractual obligations owing to PMCF.

## JURISDICTION, THE PARTIES AND VENUE

4.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.   The amount in controversy exceeds $75,000.00, exclusive of costs and interest. Moreover, pursuant to paragraph 10 of the parties' contract (Exhibit A hereto), the parties further agreed that this Court has sole and exclusive subject matter and personal jurisdiction over this dispute.

5.      Plaintiff P&M Corporate Finance, LLC ("PMCF") is a Michigan limited liability company with its principal place of business in Southfield, Michigan.

6.      Defendant LODJS is a Florida professional association that maintained its principal place of business in Broward County, Florida, until April 2014, when it was relocated to Miami-Dade County, Florida.

7.      Defendant Stern is an individual who, upon information and belief, resides in Broward County, Florida.  Stern is the founder and was sole owner of LODJS.

8.      The locations and identities of the John Does are unknown to PMCF at the time of filing.

2

17159795.3

9.     Defendant DJSP is a British Virgin Islands company with its principal place of business in Broward County, Florida.

10.     Defendant DJS is a Delaware limited liability company with its principal place of business in Broward County, Florida.

11.     Defendant DSI is a Delaware limited liability company with its principal place of business in Broward County, Florida.

12.     PTA LLC is a Delaware limited liability company with its principal place of business in Broward County, Florida.

13.     The causes of action alleged in this Complaint arose and accrued in Broward County, Florida. Venue is proper in this District and Division under 28 U.S.C. § 1391(b) and as further agreed to between the parties in their Contract.

## GENERAL ALLEGATIONS

14.     LODJS was founded by Stern in 1994 and provided legal services and related non-legal support for residential mortgage foreclosures, including related issues such as residential foreclosure processing, bankruptcy, eviction, second lien monitoring, and real estate closings.

15.     In 2007, Stern began exploring the idea of selling the non-legal operations of his businesses.  The declining economy and rise in foreclosures made such a sale potentially attractive.

### PMCF's Agreement to Provide Investment Banking Services

16.     On or about June 11, 2007, PMCF and LODJS entered into a contract (the "Contract") (Exhibit A hereto) for PMCF to provide sell-side investment banking services to LODJS in connection with the sale of the non-legal operations of Stern's businesses.

17.   Under paragraph 8 of the Contract, LODJS promised to, among other things, indemnify and hold each Indemnified Party (as defined in the Contract) harmless "against all claims, losses, damages, liabilities, expenses and obligations (including, without limitation, attorneys' fees, costs, interest, judgments, awards, penalties, costs of third party consultants and experts, court costs and all amounts paid in investigation, defense or settlement of any of the foregoing)" which:

> arise out of, are based upon or are related to (1) PMCF's engagement under this Agreement or the rendering of services under this Agreement (including any services rendered prior to the date of this Agreement and including any claims by any person or entity relating to compensation in connection with the Transaction) or the rendering of additional services by PMCF as requested by Company, (2) any breach of this Agreement by Company or its owners, or (3) any misrepresentation of a material fact by the Company or its owners, or omission, by the Company or its owners, of a material fact necessary in order to make the statements provided not misleading in light of the circumstances under which such statements are made (collectively, "Damages").

18.   The Contract further provides that LODJS's liability under Paragraph 8 shall not apply "only if, and to the extent that, a court having competent jurisdiction has determined by final judgment (not subject to further appeal) that such Damages resulted primarily and directly from the bad faith or intentional misconduct of such Indemnified Party."

19.   From approximately June 2007 through January 2010, and pursuant to the Contract, PMCF provided sell-side investment banking services to the Stern Defendants, which ultimately culminated in the closing of a complex business transaction that included the sale of the non-legal foreclosure operations of LODJS (the "Transaction").

17159795.3

## The Transaction and Subsequent Litigation

20.     The Transaction closed on January 15, 2010, with an entity known as Chardan 2008 China Acquisition Corp. participating in the purchase of LODJS' non-legal foreclosure operations. Almost simultaneously with the closing of the Transaction, Chardan 2008 China Acquisition became known as DJSP Enterprises, Inc.

21.     In connection with the Transaction, Stern entered into a services agreement with DJSP, DAL and DJS. (Exhibit B hereto.) Pursuant to this agreement, Stern would "serve as Chairman of the Board, if approved by the Boards, and the President of each DAL, [DJS], and [DJSP]." (*Id.* ¶ 3(a)).

22.     As a result of the closing of the Transaction, Stern received approximately $52,469,000 of cash and also promissory notes for assuring payment of many additional millions of dollars.

23.     After the Transaction closed, LODJS became the subject of an investigation by the Florida Attorney General's office and eventually lost all of its major clients. Accordingly, LODJS began to wind down its business and ceased operations effective March 31, 2011.

24.     On January 3, 2012, DJSP, DAL and DJS sued the Stern Defendants in connection with the Transaction in a Broward County, Florida state court action entitled *DJSP Enterprises, Inc. v. David J. Stern, et al.*, Case No 12-00096 (the "DJSP Litigation"). DJSP also sued PMCF in connection with the Transaction.

25.     In mid-2014, the Stern Defendants settled with the plaintiffs and were dismissed from the DJSP Litigation. Although the terms of that settlement are confidential, PMCF believes that a substantial sum of money was paid by the Stern Defendants to DJSP Defendants.

17159795.3

26.     On February 3, 2015, the Court in the DJSP Litigation granted summary judgment in favor of PMCF and against DJSP on all of DJSP's claims in the DJSP Litigation, and thereafter entered judgment in PMCF's favor (Exhibit C hereto).

27.     On April 19, 2012 the Stern Defendants were notified of PMCF's intent to enforce the rights under Paragraph 8 of the Contract.  (Exhibit D hereto).

28.     During the course of defending the DJSP Litigation, PMCF incurred substantial costs and attorneys' fees that are subject to the Stern Defendants' indemnification obligation, and which are well in excess of the $75,000 jurisdictional amount in controversy.

### LODJS Collects Substantial Fees During Its Wind-Down

29.     During the pendency of the DJSP Litigation, and in connection with the wind-down of LODJS, LODJS filed several lawsuits against its former clients to collect outstanding fees due to LODJS.

30.     On information and belief, during the period of approximately 2011 through 2014, LODJS obtained millions of dollars (the "Collected Fees") from its former clients.

31.     After collecting the Collected Fees, upon information and belief, LODJS transferred part or all of the Collected Fees to the John Does and/or the DJSP Defendants.

32.     Upon information and belief, LODJS made the transfers when the Stern Defendants had knowledge of the DJSP Litigation, and even after PMCF's demand for indemnification, with the intent to prevent its creditors, such as PMCF, from accessing the Collected Fees through rightful claims.

33.     At the time of this filing, the identities of the John Does are unknown to PMCF.

17159795.3

**The Stern Defendants' Refusal to Indemnify PMCF**

34.     The Stern Defendants have had notice of PMCF's intent to seek indemnification from LODJS since at least April 19, 2012, when PMCF notified LODJS that it was preserving its rights to seek indemnification under the Contract.  (Exhibit D hereto).

35.     On April 24, 2012, LODJS's attorneys acknowledged receipt of the April 19, 2012 letter and notified PMCF that they would "respond further once we have had an opportunity to discuss it."  (Exhibit E hereto).

36.     On May 1, 2013, LODJS's attorneys wrote to counsel for PMCF again acknowledging receipt of PMCF's April 19, 2012 letter, but denying that PMCF had "any right to indemnity under the terms of the [Agreement] for the claim made against it" in the DJSP Litigation in connection with the Transaction.  (Exhibit F hereto).

37.     Since May 1, 2013, the Stern Defendants have continually refused to indemnify PMCF for its expenses relating to the Transaction, including, but not limited to, its attorneys' fees and costs in defending the claims asserted against it in the DJSP Litigation.

38.     All conditions precedent to bringing this action have been performed, waived or excused.

## CAUSES OF ACTION

### COUNT I
Breach of Contract – Indemnification
(As to Defendant LODJS Only)

39.     PMCF restates the allegations set forth in paragraphs 1-37 as through fully set forth herein.

40.     PMCF has an enforceable Contract with LODJS.

41.     PMCF performed its duties under the Contract.

17159795.3

42.     LODJS is obligated by the Contract to indemnify PMCF against expenses it incurred in connection with the DJSP Litigation.

43.     LODJS has breached the Contract as more fully set forth above.

44.     As a result of LODJS's breach of the Contract, PMCF has suffered substantial damages.

WHEREFORE, PMCF respectfully requests that this Court enter a judgment against LODJS, award PMCF compensatory damages in an amount to be determined by the Court, prejudgment interest, attorneys' fees and costs pursuant to paragraph 8 of the Contract, and grant PMCF such other and further relief as this Court deems just and proper.

## COUNT II
### Breach of Contract – Indemnification/Alter Ego
### (As to Defendant Stern Only)

45.     PMCF restates the allegations set forth in paragraphs 1-37 as through fully set forth herein.

46.     At all material times, Stern has been the sole owner and principal of LODJS.

47.     Stern dominated and controlled both LODJS and the Transaction.

48.     Stern received virtually all of the proceeds of the Transaction ("Sales Proceeds"), with LODJS receiving virtually none.

49.     By routing the Sale Proceeds to Stern rather than to LODJS, Stern willfully drained LODJS of monies that Stern knew would be sought by creditors such as PMCF.

50.     Stern routed the Sale Proceeds to himself rather than to LODJS with the intent to deprive creditors such as PMCF of satisfaction for their rightful claims.

51.     By this wrongful conduct, Stern remains liable for LODJS's obligations relating to the Transaction as an alter ego of LODJS.

8

52.     LODJS is obligated to PMCF as set forth above.

53.     As a result of Stern's actions, and his liability for the actions of LODJS, PMCF has suffered substantial damages.

WHEREFORE, PMCF respectfully requests that this Court enter a judgment against Stern, award PMCF compensatory damages in an amount to be determined by the Court, prejudgment interest, attorneys' fees and costs pursuant to paragraph 8 of the Contract, and grant PMCF such other and further relief as this Court deems just and proper.

## COUNT III
Fraudulent Transfer under Uniform Fraudulent Transfer Act, § 726.105
(As to All Defendants)

54.     PMCF restates the allegations set forth in paragraphs 1-37 as through fully set forth herein.

55.     On information and belief, the Collected Fees during LODJS's wind down process totaled between approximately $15 million and $50 million.

56.     During the time that they were pursuing the Collected Fees, the Stern Defendants were aware of the DJSP Litigation or the potential for such litigation to occur, and that the DJSP Litigation would result in substantial costs to the Stern Defendants, including the right of PMCF to indemnity.

57.     After collecting the substantial Collected Fees through the wind-down process, upon information and belief, the Stern Defendants transferred part or all of the Collected Fees to Stern, the DJSP Defendants and/or the John Does (the "Fraudulent Transfers").

58.     The Stern Defendants transferred the Collected Fees to Stern, the DJSP Defendants, and/or the John Does with actual intent to hinder, delay, or defraud PMCF from

recovering on its rightful claim for indemnification, or without receiving a reasonably equivalent value in exchange for the Fraudulent Transfers.

59.     Upon information and belief, one or more factors of §726.105(1)(b) and §726.105(2), Fla. Stat. were present with respect to the transfers in question.

60.     As a direct and proximate result of the Fraudulent Transfers, PMCF has not been indemnified or fully satisfied by the Stern Defendants pursuant to the terms of the Contract.

61.     The Fraudulent Transfers are avoidable.

62.     As a result of the foregoing, PMCF is entitled to avoidance of the Fraudulent Transfers pursuant to the Florida Uniform Fraudulent Transfers Act.

WHEREFORE, PMCF respectfully requests that this Court enter a judgment against Defendants pursuant to the Florida Uniform Fraudulent Transfers Act, avoiding and recovering the Fraudulent Transfers, or the value thereof, from Defendants for PMCF's benefit and any other relief as the circumstances may require.

### COUNT IV
Fraudulent Transfer under Uniform Fraudulent Transfer Act, § 726.106
(As to All Defendants)

63.     PMCF restates the allegations set forth in paragraphs 1-37 as through fully set forth herein.

64.     On information and belief, the Stern Defendants' Collected Fees during LODJS's wind down process totaled between approximately $15 million and $50 million.

65.     During the time that they were pursuing the Collected Fees, the Stern Defendants were aware of the DJSP Litigation or the potential for such litigation to occur, as well as PMCF's demand for indemnification in connection with that litigation, and that the DJSP Litigation

would result in substantial costs to the Stern Defendants, including the right of PMCF to indemnity.

66.     After collecting the substantial Collected Fees through the wind-down process, upon information and belief, the Stern Defendants transferred part or all of the Collected Fees to Stern, the DJSP Defendants and/or the John Does, some or all of whom were insiders.

67.     The Stern Defendants also transferred the Collected Fees without receiving a reasonably equivalent value in exchange for the Fraudulent Transfers.

68.     The Fraudulent Transfers were made while LODJS was insolvent or would become insolvent as a result of the Fraudulent Transfers, and Defendants knew or had reasonable cause to believe LODJS was insolvent.

WHEREFORE, PMCF respectfully requests that this Court enter a judgment against Defendants pursuant to the Florida Uniform Fraudulent Transfers Act, avoiding and recovering the Fraudulent Transfers, or the value thereof, from the Defendants for PMCF's benefit and any other relief as the circumstances may require.

Dated: June 1, 2015          Respectfully submitted,

                             WALDMAN TRIGOBOFF HILDEBRANDT
                              MARX & CALNAN, P.A.
                             Co-counsel for P&M Corporate Finance, LLC
                             500 East Broward Boulevard, Suite 1700
                             Fort Lauderdale, Florida 33394
                             Telephone: (954) 467-8600
                             Facsimile: (954) 467-6222

                             By:/s/ Glenn J. Waldman
                                  Glenn J. Waldman
                                       Florida Bar No. 374113
                                  Craig J. Trigoboff
                                       Florida Bar No. 880541

17159795.3

-AND-

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Co-Counsel for P&M Corporate Finance, LLC
660 Woodward Avenue, Suite 2290
Detroit, Michigan 48226
Telephone: (313) 465-7412
Facsimile: (313) 465-7413
     Raymond W. Henney, Esq.
         (Pro Hac Vice)
     Michael P. Hindelang, Esq.
         (Pro Hac Vice)
     John J. Rolecki, Esq.
         (Pro Hac Vice)

17159795.3

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served electronically via the ECF system on June 1, 2015, and via email on all counsel and parties of record on the Service List below:

By: /s/ Craig J. Trigoboff_____
Craig J. Trigoboff
Florida Bar No. 880541

### Service List:

Jose M. Ferrer
BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, 23rd Floor
Miami, Florida 33131-3456
Telephone: (305) 350-7210
jferrer@bilzin.com

13

17159795.3

06-04-'12 14:51 FROM-                                    T-767  P0022/0036 F-205

## P&M CORPORATE FINANCE, LLC
### INVESTMENT BANKING FOR THE MIDDLE MARKET

JUN 11 2007

Mr. David J. Stern
David J. Stern, P.A.
901 South University Drive
Suite 500
Plantation, FL 33324

Dear David:

We are pleased to confirm that David J. Stern, P.A. (the "Company") has retained P&M Corporate Finance, LLC ("PMCF") on the following basis:

    1.    The Company engages PMCF as its exclusive advisor for the purpose of (a) identifying opportunities for a Transaction (as defined below); (b) advising the Company concerning such opportunities; and (c) as requested by the Company, participating on the Company's behalf in negotiations with respect to such Transaction. As used in this letter agreement (this "Agreement"), a "Transaction" means any transaction or series of transactions, other than in the ordinary course of the Company's trade or business, whereby, directly or indirectly, control of or a material interest in the Company or any of its businesses, subsidiaries or divisions, or any of their respective assets, is transferred for Consideration by the current owners, including, without limitation, a sale or exchange of capital stock or assets; a leveraged buyout, spinoff, licensing or similar option, a merger, consolidation or reorganization, a tender or exchange offer, a leveraged buyout, spinoff, licensing or similar structure of technology owned or developed by the Company, formation of a joint venture, strategic alliance, minority investment or partnership or other similar transaction.

    2.    As compensation for the services rendered by PMCF, the Company will pay PMCF as follows:

    (a)    A progress fee of $50,000 payable upon the presentation of an offer, evidenced by a letter of intent, to enter into a Transaction involving $250 million or more of Consideration from a buyer that has a demonstrated ability to close the Transaction on terms and conditions acceptable to the Company. This fee will be credited against any Transaction Fee which is to be paid under paragraph 2(b) below.

    (b)    A Fee ("Transaction Fee") equal to 1.5% of the Consideration (as defined in paragraph 12 below) up to $250 million, plus 2.5% of the Consideration in excess of $250 million. It is expressly understood that a separate Transaction Fee shall be payable in respect of each Transaction in the event that more than one Transaction shall occur.

    (c)    PMCF will render its statements for services, which will contain the Transaction Fee, at the closing of each Transaction. The Company will pay the Transaction Fee to PMCF, in immediately available funds, at the closing of each Transaction. That portion of any Transaction Fee which is attributable to Consideration which is contingent upon some future event (e.g., an earnout) will be paid to PMCF when and as the amount of the contingent payment or any portion becomes Consideration. The Company will promptly notify PMCF of each such event and will cooperate with PMCF in verifying such amount.

    (d)    The Company will also pay PMCF a nonrefundable, cash "breakaway" fee of $500,000 if the Company or its owners reject a bona fide offer, evidenced by a letter of intent, to enter into a Transaction involving $250 million or more of Consideration from a buyer that has a demonstrated ability to close the Transaction on terms and conditions acceptable to the Company and there does not occur within a 3 month period following such rejection (the "Breakaway Period") one or more Transactions with respect to which PMCF receives total Transaction Fees of at least $500,000. Any Transaction Fees received by PMCF will be credited towards the breakaway fee.





EXHIBIT

A

06-24-'12 14:51 FROM-

T-767  P0023/0036 F-205

Mr. David J. Siena
June 11, 2007
Page 2

3.      Either the Company or PMCF may terminate this Agreement upon written notice to the other, except that:

(a)      the Company will remain obligated to pay PMCF (1) approved out-of-pocket expenses under this Agreement, incurred through the effective date of termination, (2) the Transaction Fee if within 12 months of the termination of this Agreement the Company completes or enters into a binding agreement with a party introduced by PMCF or a party whose interest in a potential Transaction became known to the Company prior to the termination of this agreement and the binding agreement results in a closed Transaction; and (3) any breakaway fee earned under paragraph 2(d) above; and

(b)      the Company will remain liable for all of its obligations pursuant to paragraph 8 below.

4.      The Company will reimburse only PMCF for its reasonable out-of-pocket travel expenses incurred in connection with this Agreement and the Transaction, regardless of whether a Transaction is actually completed. Such reimbursement is subject to a cap of $25,000 and qualifying travel costs must be pre approved by the Company. PMCF will not invoice the Company for costs not directly incurred by PMCF. Amounts reimbursed will be credited against any Transaction Fee which is to be paid under paragraph 2(b) above.

5.      The Company acknowledges that PMCF, in the course of performance of its services under this Agreement, will rely on and assume the accuracy and completeness of all financial and other information furnished by or disclosed by the Company, its owners and other public and private sources. PMCF will have no obligation to independently verify any such information or to conduct any independent evaluation or appraisal of any of the assets or liabilities of the Company.

6.      Each party disclaims any intention to impose fiduciary obligations on the other by virtue of the engagement contemplated by this Agreement. PMCF will be an independent contractor for all purposes of this Agreement and in the performance of its services to the Company. The Company acknowledges that PMCF is an affiliate of Plante & Moran, PLLC ("Plante & Moran"), a large public accounting firm with a significant number of practice areas, and that it may be the case that Plante & Moran, PMCF or one or more of their affiliates. PMCF will not be responsible or liable to the Company in any manner for any failure to disclose to the Company any relationship Plante & Moran or any of its affiliates (other than PMCF) has or had with any party that PMCF identifies as a possible Transaction party or that enters into a Transaction with the Company. PMCF will disclose to the Company any relationship PMCF has or had with any party that PMCF identifies as a possible Transaction party or that enters into a Transaction with the Company.

7.      During the period that PMCF is engaged by the Company, the Company will promptly inform PMCF, or cause PMCF to be informed, of the identity of any party that makes any such inquiry or whose interest in a possible Transaction becomes known to the Company during the period that PMCF is engaged by the Company.

8.      (a)      The Company will indemnify and hold harmless PMCF and its partners, directors, members, managers, principals, affiliates, representatives, agents, employees, successors and assigns and any person retained by PMCF in connection with the performance of the services described in this Agreement and their partners, directors, members, managers, principals, affiliates, representatives, agents, employees, successors and assigns (each an "Indemnified Party"), from and against all claims, losses, damages, liabilities, expenses and obligations (including, without limitation, attorneys' fees, costs, interest, judgments, awards, penalties, costs of third party consultants and experts, court costs and all amounts paid in investigation, defense or settlement of any of the foregoing), whether fixed, actual, accrued or contingent, liquidated or unliquidated, direct, indirect, special or consequential, which arise out of, are based upon or are related to: (1) PMCF's engagement under this Agreement or the rendering of services under this Agreement (including any services rendered prior to the date of this Agreement and including any claims by any person or entity relating to compensation in connection with the



P&M CORPORATE FINANCE, LLC
INVESTMENT BANKING FOR THE MIDDLE MARKET

06-04-'12 14:51 FROM-

T-767  P0024/0036  F-205

Mr. David J. Stern
June 11, 2007
Page 3

Transaction) or the rendering of additional services by PMCF as required by the Company or its owners, or (3) any misrepresentation of a material fact by Company (2) any breach of this Agreement by Company or its owners, of a material fact necessary in order to make the statements provided not misleading in light of the circumstances under which such statements are made (collectively, "Damages"). The Company will not be liable pursuant to this paragraph 8 for Damages incurred by an Indemnified Party only if, and to the extent that, a court having competent jurisdiction has determined by final judgment (not subject to further appeal) that such Damages resulted primarily and directly from the bad faith or intentional misconduct of such Indemnified Party. The rights of an Indemnified Party under this paragraph 8 shall be in addition to any rights the Indemnified Person may have at common law or otherwise.

(b)     The Company shall have the right to control the defense of any claim for which indemnification may be sought hereunder (and the costs related thereto), including the right to select counsel for any Indemnified Party, with such counsel subject to the approval of the Indemnified Party, which approval will not be unreasonably withheld, unless (i) the Company has failed to provide legal counsel reasonably satisfactory to such Indemnified Party in a timely manner or (ii) such Indemnified Party shall have reasonably concluded that (a) the representation of such Indemnified Party by legal counsel selected by the Company would be inappropriate due to actual or potential conflicts of interest or (b) there may be legal defenses available to such Indemnified Party that are different from or additional to those available to the Company or any other Indemnified Party represented by such legal counsel.

(c)     The Company shall not, except with the written consent of the Indemnified Party, consent to the entry of a judgment or settlement of any pending or threatened claims related to or arising out of this engagement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party an unconditional release, and holding such Indemnified Party harmless, from all liability in respect of such third party claim or demand. The Company shall not be liable for any settlement effected without its prior written consent.

9.     Notices under this Agreement must be in writing and be mailed, sent by recognized overnight courier, telecopied or hand delivered (a) if to the Company, at its offices at 801 South University Drive, Suite 500, Plantation, FL 33324, Attention: David J. Stern, Esq.; and (b) if to PMCF, at its offices at 26300 Northwestern Highway, Suite 120, Southfield, MI 48037, Attention Mr. Phil Gilbert.

10.     This Agreement will be governed by, and construed in accordance with, the laws of the State of Florida, without giving effect to Florida's conflict of law principles. All disputes arising out of or in connection with this Agreement shall be solely and exclusively resolved by the United States District Court for the Southern District of Florida. The parties submit to the jurisdiction of and venue in the United States District Court for the Southern District of Florida. EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION, CLAIM OR PROCEEDING (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE), RELATING TO OR ARISING OUT OF THIS AGREEMENT, ANY TRANSACTION, THE ENGAGEMENT OF PMCF PURSUANT HERETO OR THE PERFORMANCE BY PMCF OF THE SERVICES CONTEMPLATED BY THIS AGREEMENT.

11.     Except as required by applicable law or as expressly provided for in this paragraph 11, any advice provided by PMCF under this Agreement (including, without limitation, any opinion issued by PMCF) shall not be disclosed publicly or made available to third parties without the prior written approval of PMCF, and accordingly such advice shall not be relied upon by any person or entity other than the Company. The Company may disclose such advice to its representatives who need to know such advice to assist the Company to evaluate the proposed Transaction. The Company shall inform such representatives of the confidential nature of such advice and direct them to treat such advice confidentially and shall be responsible for any misuse or disclosure of such advice by any such person.

Mr. David J. Stern
June 11, 2007
Page 4

12.   For purposes of this Agreement, "Consideration" will be determined as follows:

(1)   Consideration will include the total value of all cash, promissory notes, securities and other property paid or otherwise delivered by the acquiring parties to the selling parties (selling parties include cumulatively the Company, its partners, members, shareholders, other owners, managers, officers, directors and any affiliated persons or entities in the Transaction), including amounts paid in escrow accounts and amounts to be paid in installments or future payments. The Transaction Fee for escrowed amounts and installment payments will be payable to PMCF when received by the selling party.

(2)   Consideration will also include (A) all borrowed money of the selling parties which are assumed by any acquiring party in the Transaction, and (B) the value of all contracts for property or services rendered, or to be rendered by any selling party, such as management contracts, employment agreements, non-compete agreements, consulting agreements, leases and similar arrangements, but not including reasonable compensation for services to be rendered by shareholders in their capacities as employees or consultants of the acquiring or acquired parties after the closing date.

(3)   Consideration will not include the assets and liabilities of David J. Stern, P.A. after a Transaction, other than for the interest, if any, that a selling party has in a to be formed entity focused on providing non-legal processing services (including title services and REO services) related to the mortgage foreclosure industry.

(4)   The value of securities (debt or equity) or other property sold, received, transferred or retained will be determined as follows:

(A)   the value of securities that are freely tradable in an established public market will be determined on the basis of the last market closing before the Transaction closes;

(B)   the value of any other securities, property or contract rights will be the fair market value, determined by the Company and PMCF and, if we are unable to agree, by an investment banking firm recognized in the merger and acquisition field which (i) has no direct involvement in the Transaction or with the parties to the Transaction and (ii) is acceptable to both the Company and PMCF;

(C)   the value of promissory notes and any other indebtedness will be the stated principal amount of such note or indebtedness; and

(D)   Such value shall be subject to equitable adjustment whenever there shall occur a stock dividend, distribution, combination of shares, reclassification, stock split, or other similar event with respect to the Company's common stock.

(5)   If, in lieu of receiving all or any portion of the type of consideration payable to the Company or the other shareholders, members, partners or other owners of the Company in connection with a Transaction, any such party acquires an ownership interest in a to be formed entity focused on providing non-legal processing services (including title services and REO services) related to the mortgage foreclosure industry, the Consideration shall be calculated

P&M CORPORATE FINANCE, LLC
INVESTMENT BANKING FOR THE MIDDLE MARKET

06-04-'12 14:52 FROM-                                                T-767  P0026/0036 F-205

Mr. David J. Stern
June 11, 2007
Page 3

by assuming that each owner has sold its entire ownership interest in such entity and
received in exchange therefore an amount per share or other ownership unit equal to that
received by the Company or the other owners of the Company, as the case may be, in the
Transaction.

13.    The Confidentiality Agreement executed heretofore by and between the Company and FMCF shall remain in
full force and effect and its terms are hereby incorporated by reference into this engagement agreement as if fully set out
herein. Further, FMCF agrees that it will, prior to disclosing to any person any "Confidential Information" as that term is
defined in the "Confidentiality Agreement," require that any such person execute a confidentiality agreement in a form
acceptable to the Company.

Please confirm your agreement with the foregoing by dating, signing and returning the enclosed copy of this Agreement,
whereupon it will become binding and enforceable in accordance with its terms.

We are delighted to accept this engagement and look forward to working together with you on this assignment.

Sincerely,

F&M CORPORATE FINANCE, LLC

By: _____

Agreed to on this JUNE 11 , 2007:

DAVID A STERN, P.A.

By: _____

Name: David J. Stern

Title: President



# STERN EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made as of January 15, 2010, between DAL Group, LLC, a Delaware limited liability company ("DAL"), DJS Processing, LLC, a Delaware limited liability company ("Processing", and collectively with DAL, the "Companies," or individually, a "Company"), Chardan 2008 China Acquisition Corp. ("Chardan"), and David J. Stern ("Executive").

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Employment.** Chardan and the Companies shall each employ Executive, and Executive hereby accepts employment with each of Chardan and the Companies, upon the terms and conditions set forth in this Agreement, for the period beginning on the date of this Agreement and ending as provided in Section 5 of this Agreement (the "Employment Period").

2. **Defined Terms.**

(a) An "Affiliate" is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

(b) "Base Salary" is defined in Section 4(a).

(c) "Base Salary Severance Benefit" is defined in Section 6(a).

(d) "Base Salary Severance 409A Cap" means two (2) times the lesser of (I) the maximum dollar amount that may be taken into account under a qualified plan pursuant to Code Section 401(a)(17) for the year in which Executive's employment is terminated or (II) the sum of Executive's annualized compensation based upon the annual rate of pay for services to the Companies and Chardan for the taxable year prior to the taxable year in which Executive's termination occurs (adjusted for any increase during that year that was expected to continue indefinitely if Executive's employment had not terminated).

(e) The "Boards" means, collectively, the Board of Managers of DAL and Chardan's Board of Directors, and each are individually referred to in this Agreement as a "Board."

(f) "Cause" means the occurrence of any of the following events, as determined by both Boards in good faith:

(e)     Executive's theft, material act of dishonesty or fraud, or intentional falsification of any records of Chardan, any Company or their Affiliates;

(f)     Executive's material breach of (A) this Agreement or any of the Companies' written policies applicable to Executive; (B) the Confidentiality Agreement; (C) any other agreement with Chardan, any Company or their Affiliates (1) covering the uses or disclosure of confidential or proprietary information of Chardan or the Companies or their Affiliates, customers or clients, (2) covering ownership of intellectual property or restrictions on competition or (3) regarding solicitation of employees or agents; in each case, after written notice is delivered identifying the breach, and such breach is not cured within thirty (30) days following receipt of such notice;

(g)     Executive's fraudulent activities, gross negligence or willful misconduct in the performance of Executive's assigned duties (but not mere unsatisfactory performance);

(h)     Executive's conviction (including plea of guilty or *nolo contendere*) of a crime involving (A) imprisonment or (B) theft, dishonesty, fraud or moral turpitude;

(iv)     Executive terminates his position or employment at one or more of Chardan or the Companies, but not all such entities, except if otherwise agreed by the Boards or required by applicable law, including, but not limited to, the Rules Regulating the Florida Bar; or

(v)     Processing terminates the Services Agreement between Processing and DJS, as a result of a material breach of the Services Agreement by DJS.

"Change in Control" shall be deemed to have occurred upon the occurrence of any of the following events:

(i)     A merger involving Chardan in which Chardan is not the surviving company if, following the merger, the shareholders of Chardan immediately prior to the merger do not own more than fifty percent (50%) of the total voting power of the surviving company;

(ii)     A share exchange in which the shareholders of Chardan exchange their shares in Chardan for shares of another corporation, provided, that such share exchange shall result in the shareholders of Chardan owning less than fifty percent (50%) of the total fair market value or total voting power of Chardan's then outstanding shares outstanding before such share exchange for shares of another corporation, following the share exchange, the shareholders of Chardan immediately prior to the share exchange do not own more than fifty percent (50%) of the total voting power of such other corporation following the share exchange;

(iii)     A sale of all or substantially all of the assets of Chardan, except to an Affiliate, in which case the Affiliate thereafter be deemed to be a Company for purposes of the definition of "Change in Control," and except if, following the sale, the

2

shareholders of Chardan immediately prior to the sale own more than fifty percent (50%) of the voting power, directly or indirectly, of the acquiring company;

(iv)   Any person or group of persons (as defined in Section 13(d) of the Securities Exchange Act of 1934, as amended) (other than Executive or any Affiliate of Executive or any employee benefit plan or employee benefit trust benefiting the employees of the Company) becoming a beneficial owner, directly or indirectly, of securities of Chardan representing more than fifty percent (50%) of either the total fair market value of Chardan's securities, or the combined voting power of Chardan's then outstanding voting securities;

(v)   A merger or share exchange involving either of the Companies, if following the transaction, the shareholders of Chardan immediately prior to the merger or share exchange do not own more than fifty percent (50%) of the total voting power, directly or indirectly, of the surviving or acquiring company;

(vi)   A sale by the Companies of all or substantially all of their assets, except to an Affiliate, in which case the Affiliate shall thereafter be deemed to be a Company for purposes of the definition of "Change in Control", if, following the sale, the shareholders of Chardan immediately prior to the sale do not own more than fifty percent (50%) of the total voting power, directly or indirectly, of the acquiring company; or

(vii)   Either Company is no longer an Affiliate of Chardan, if, following the applicable transaction, the shareholders of Chardan immediately prior to the transaction do not own more than fifty percent (50%) of the total voting power of the company that owns such entity.

Notwithstanding any other provision in this Agreement, to the extent that any payment subject to Code Section 409A is payable upon a Change in Control, an event shall not be considered to be a "Change in Control under this Agreement with respect to such payment unless such event is also a "change in ownership", a "change in effective control" or a "change in the ownership of a substantial portion of the assets" of either Company or Chardan, in each case, within the meaning of Code Section 409A.

(i)   "Chardan" is defined in the preamble.

(j)   "Code" means the Internal Revenue Code of 1986, as amended.

(k)   "Code Section 409A" means Code Section 409A and the guidance issued thereunder.

(l)   "Code Section 457A" means Code Section 457A and the guidance issued thereunder.

(m)   "Company" and "Companies" are defined in the preamble.

3

(a)     "Confidentiality Agreement" means that certain Confidentiality and Noncompetition Agreement among Executive, DJSP, Processing and Chardan, dated as of the date of this Agreement.

(o)     "DAI" is defined in the preamble.

(p)     "Disability" means Executive's substantial inability to perform Executive's duties for such period as would qualify Executive for benefit under the Companies' long-term disability insurance policy provided to Executive by DJS or one of the Companies or, if no such policy is provided, Executive's disability which prevents Executive from performing, with or without a reasonable accommodation, substantially all of the duties assigned to Executive for a continuous period exceeding six (6) months. The determination of Disability shall be made by a medical board-certified physician mutually acceptable to Chardan, the Company (or Executive's legal representative, if one has been appointed), and Executive (or Executive's legal representative, if one has been appointed), and if the parties cannot initially agree to the selection of a physician, then each party shall select such a physician, and the two physicians so selected shall select a third physician who shall make such determination.

(q)     "DJS" is defined as the Law Offices of David J. Stern, P.A.

(r)     "Employee Benefit Plan Payment" is defined as benefits, if any, due to Executive or Executive's estate, surviving dependents or designated beneficiaries under the employee benefit plans and programs and compensation plans and programs (excluding this Agreement) maintained for the benefit of the officers and employees of the Companies or Chardan in which Executive participated at Executive's termination date, to be paid at the same time and on the terms and conditions applicable under the relevant plan; provided, that Executive shall not accrue any additional benefit under any such employee benefit plans and programs and compensation plans and programs maintained by the Company and Chardan following the date of Executive's termination of employment.

(s)     "Employment Period" is defined in Section 1.

(t)     "Executive" is defined in the preamble.

(u)     "Good Reason" means the occurrence of any of the following events without Executive's written consent, if Executive terminates employment within thirty (30) days following the end of Chardan and the Companies' cure period set forth in, and subject to the requirements of, Section 6(b) of this Agreement:

(i)     material diminution in Executive's position, duties, responsibilities or status with Chardan and the Companies (except as provided in the DAI, Amended and Restated Limited Liability Company Agreement), in each case after written notice is delivered identifying the breach;

(ii)    any diminution in Executive's Base Salary then in effect, which reduces such Base Salary by five percent (5%) or more, unless a greater reduction is required by Code Section 409A to constitute an "involuntary separation from service" or

4

unless such reduction occurs in connection, and on a proportionate basis, with a general decrease in executive compensation at Chardan and the Companies, but in no event may the total reductions in Base Salary be twenty-five percent (25%) or more of the highest level of Base Salary in effect during the term of this Agreement without triggering this provision; or

(iii)   Chardan and the Companies' material breach of any provision in this Agreement after written notice is delivered identifying the breach.

(v)   "Good Reason Notice" is defined in Section 6(b).

(w)   "Release" is defined in Section 6(a).

(x)   "Partial Termination" means termination of Executive's position or employment by one or more of Chardan or the Companies, other than a termination of Executive's position or employment by all of Chardan and the Companies.

(y)   "Processing" is defined in the preamble.

(z)   "Severance Benefit" is defined in Section 6(a)

(aa)   "Severance Period" is defined in Section 6(e).

3.   Position and Duties.

(a)   During the Employment Period, Executive shall serve as Chairman of the Board, if approved by the Boards, and the President of each of DAI, Processing, and Chardan and shall have the normal duties, responsibilities, functions and authority of the president and chief executive officer of a company incorporated under the laws of Delaware and as set forth in the organizational documents of Chardan and each Company, and such other duties, responsibilities, functions and authority as the Boards of such entities may direct.

(b)   Executive shall report to the Boards.   Executive shall allocate his business time and attention relating to the Companies, Chardan and DJS among such companies as he may determine in his reasonable business judgment.

(c)   During the Employment Period, Executive shall be responsible for directing Processing's performance of its obligations under that certain Services Agreement with DJS, including, but not limited to, having authority to direct Processing to establish internal policies and procedures designed to provide reasonable assurance that Processing's employees (i) act in a way compatible with the Rules Regulating the Florida Bar, (ii) work under the direction and supervision of an attorney for work requiring such direction and supervision, (iii) maintain the confidentiality of the confidential and privileged information of DJS' clients; and (iv) perform services in accordance with the requirements of the Services Agreement. In the event that DJS provides notice of a default by Processing under the Services Agreement, the Board of Processing may appoint a Committee of independent members of the Board of Processing

5

to direct Processing's activities in response to such notice and suspend Executive's responsibilities relating thereto pending the resolution of such default.

(d)   Chardan and the Companies shall not relocate Executive's principal place of employment more than fifty (50) miles from Executive's then current place of employment, unless approved by Executive or unless the relocation is in connection with a change in the Companies' offices recommended by Executive.

4.   Compensation and Benefits.

(a)   Commencing on the date of this Agreement and throughout the Employment Period, Executive's aggregate base salary shall be four hundred thirty-one thousand five hundred dollars ($431,500) per annum and shall be reviewed annually for discretionary adjustment, if any, by the Compensation Committee of the Board of Chardan (as modified from time to time, the "Base Salary"). The Base Salary shall be payable to Executive by Processing in regular installments in accordance with Processing's general payroll practices (in effect from time to time).

(b)   During the Employment Period, Executive shall not be entitled to participate in employee benefit programs for which executives of Chardan, DAL, or Processing are generally eligible, except as otherwise determined by the Board of Chardan.

(c)   During the Employment Period, Chardan, DAL and Processing shall reimburse Executive for all reasonable business expenses incurred by him in the course of performing his duties and responsibilities under this Agreement which are consistent with Chardan's, DAL's and Processing's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to Chardan's, DAL's and Processing's requirements with respect to reporting and documentation of such expenses. Executive shall submit requests for reimbursement under this Section 4(c) within sixty (60) days after incurring an expense permitted under this Section 4(c) and, to the extent that such expense is determined to be a reasonable business expense under this Section 4(c) by the employer from who Executive is seeking reimbursement, Executive shall be reimbursed within sixty (60) days following Executive submitting such expense.

(d)   During the Employment Period, Executive shall be eligible to receive bonuses, as determined by the Board of Chardan in its sole discretion, payable at the time set forth in the applicable bonus program but no later than the fifteenth (15th) day of the third (3rd) month following the year in which the bonus is no longer subject to a "substantial risk of forfeiture" (as defined under Code Section 409A); provided that in no event may Executive's bonus be greater than 100% of Executive's base salary. Any bonus shall be limited to amounts which constitute "performance-based compensation" under Code Section 162(m) and which are fully deductible by the Company.

(e)   From the date hereof until the first anniversary of this Agreement, and for every one-year period thereafter during the Employment Period, Executive shall

be entitled to take reasonable vacation time, but in no event less than the amount of time allowed to other Company executives, and paid time off ("PTO") in accordance with Company policy in effect from time to time, with no carryover of unused vacation time from one year to the next. All vacation and PTO are accrued and available for use in accordance with applicable Company policy.

(f)     In addition to the Base Salary, Executive shall be eligible to participate in Chardan's equity incentive plans as determined by Chardan and DAL's Board from time to time. Grants under such equity incentive plans shall be governed by separate form agreements applicable to all participants in those plans.

5.     Term.

(a)     The Employment Period shall begin on the date of this Agreement and end on January 15, 2015, subject to earlier termination (i) by reason of Executive's death or Disability, (ii) by Chardan and both Companies at any time for Cause, (iii) by Chardan and both Companies at any time without Cause, or (iv) by Executive for Good Reason, and in the case of (iv) pursuant to written notice to Chardan and each Company.

In the event that Executive terminates this Agreement without Good Reason during any portion of the Employment Period during which a majority of the members of the Chardan Board of Directors consist of persons designated or nominated by Executive or his Affiliates (or Executive has been provided the opportunity to designate or nominate a majority of the members of the Chardan Board of Directors and has declined to do so), except a termination resulting from Executive's death or disability or as required by applicable laws, including, but not limited to, the Rules Regulating the Florida Bar, Executive shall be liable for any resulting damages to Chardan and the Companies, up to an amount equal to the greater of (i) the value as of the date of this Agreement of one half of (A) the DAL Common Units received upon the conversion of each tranche of the Series B Preferred Units acquired by Executive or his Affiliates and (ii) thirteen million five hundred thousand dollars ($13,500,000.00). If Executive has terminated his employment resulting in damages as provided in the prior sentence, any such damage award owed by Executive to Chardan or the Companies must first be collected from Chardan Ordinary Shares or DAL Common Units held by Executive or, at Executive's option, cash, or a combination thereof. For purposes of this Section 5(a), each Chardan Ordinary Share and DAL Common Unit shall be valued at Market Price (as defined in the Amended and Restated Limited Liability Company Agreement of DAL and, as to a DAL Common Unit, shall be the Market Value of a Chardan Ordinary Share) on the Closing Date.

(b)     The Employment Period shall not end as a result of a Partial Termination; provided, however, that if a Partial Termination occurs, Executive shall be permitted to terminate his employment with the remaining entities. Executive's voluntary termination of his position or employment with any one of Chardan or the Companies without a simultaneous termination of Executive's position or employment at each of Chardan and the Companies, except if otherwise agreed by the Boards or required

7

by applicable law, including, but not limited to, the Rules Regulating the Florida Bar, shall be grounds for a for Cause termination of Executive's employment.

6. **Severance Benefit.**

(a) **Termination of Employment Period without Cause or for Good Reason.** If the Employment Period is terminated by Executive for Good Reason or by Chardan and the Companies for any reason other than death, Disability or Cause, provided in each case that such termination constitutes a "separation from service" as provided in Code Section 409A, and upon Executive's execution (without revocation) and delivery to Chardan and the Companies of a release (in the form attached hereto as Exhibit I) (the "Release") within twenty-one (21) days following the date of Executive's termination of employment, Executive shall be entitled to receive from Processing:

(i) earned but unpaid Base Salary through the date of Executive's termination payable in accordance with normal payroll practices but in no event commencing later than thirty (30) days following the date of Executive's termination of employment;

(ii) continuation of Executive's current Base Salary, as in effect at the time of termination, payable in the same manner and in accordance with existing payroll practices as Executive's Base Salary was paid prior to Executive's termination of employment, beginning as soon as possible after the effective date of the Release, but no later than thirty (30) days following the date of Executive's termination of employment, for a period of three (3) years following the termination date (the "Severance Period") (the benefit provided for under this Section 6(c)(ii)) shall be referred to as the "Base Salary Severance Benefit"); provided, that if Executive was a "specified employee" (as defined under Code Section 409A) on the date of Executive's termination of employment, such Base Salary Severance Benefit shall be bifurcated to the extent necessary to provide Executive with the following (A) for payments of Base Salary Severance occurring during the first six (6) months following Executive's termination date, an aggregate payment not to exceed the Base Salary Severance 409A Cap and (B) to the extent Executive's Base Salary Severance Benefit is limited by operation of the Base Salary Severance 409A Cap, any amounts of the Base Salary Severance Benefit limited by operation of the Base Salary Severance 409A Cap shall be paid pursuant to Section 6(c) of this Agreement. The payment of the amount of the Base Salary Severance Benefit which does not exceed the Base Salary Severance 409A Cap is intended to be made pursuant to a "separation pay plan" due to involuntary separation from service" pursuant to Treas. Reg. Section 1.409A-1(b)(9)(iii);

(iii) payment of all accrued, but unused, vacation days, payable in a lump sum payment no later than the thirtieth (30th) day following the termination date;

(iv) provided that such payment shall constitute "performance-based compensation" under Code Section 162(m), payment of the bonus Executive would have been entitled to in the year Executive's employment is terminated, if as of Executive's termination date the applicable performance goals had already been met, payable at the

time set forth in the applicable bonus program but no later than the fifteenth (15th) day of the third (3rd) month following the year in which Executive's employment is terminated; and

(v)     any Employee Benefit Plan Payment.

The payments and benefits under Sections 6(a)(iii), (iii) and (iv) of this Agreement shall be referred to as the "Severance Benefit."

(b)     Termination of Employment Period for Good Reason. If Executive believes that Executive has grounds for termination for Good Reason, Executive shall provide written notice of the existence of the condition constituting Good Reason to Chardan and each Company within ninety (90) days of the date that the condition arises (the "Good Reason Notice") and shall provide Chardan, DAL or Processing, as the case may be, with a period of not less than thirty (30) days in which to cure the condition and during such cure period Processing shall not be required to pay the Severance Benefit associated with a termination for Good Reason. The submission of such written notification by Executive shall not constitute Cause for Chardan or either Company to terminate Executive.

(c)     Termination of Employment Period for Cause or by Executive Without Good Reason. If the Employment Period is terminated by Chardan and the Companies for Cause, or by Executive's voluntary termination of employment (other than a termination for Good Reason), Executive shall receive the following from Processing: (i) earned but unpaid Base Salary through the date of Executive's termination of employment payable in accordance with normal payroll practices but in no event later than thirty (30) days following the date of Executive's termination of employment, (ii) accrued but unused vacation, days payable in a lump sum no later than the thirtieth (30th) day following the termination date and (iii) any Employee Benefit Plan Payment.

(d)     Termination of Employment Period — Death or Disability. If the Employment Period is terminated due to Executive's death or Disability, Executive (or, if applicable, his estate or representative) shall receive the following from Processing: (i) earned but unpaid Base Salary through the date of Executive's termination payable in accordance with normal payroll practices but in no event later than thirty (30) days following the date of Executive's termination of employment, (ii) payment for all accrued but unused vacation days, payable in a lump sum no later than the thirtieth (30th) day following the termination date, and (iii) any Employee Benefit Plan Payment.

(e)     Special 6-Month Delay Rule for Severance Benefit Payments. Notwithstanding the foregoing, if at the time of termination Executive constitutes a "specified employee" (as defined under Code Section 409A), commencing on the date that Executive is terminated, in connection with the Severance Benefit, Executive shall receive from Processing (i) the amount not in excess of the Base Salary Severance 409A Cap and the benefits that are excepted from compliance with Code Section 409A according to the terms of this Agreement or other plans or arrangements covering such

9

payments and (ii) the remaining payments in excess of the Base Salary Severance 409A Cap and the benefits not excepted from Code Section 409A, shall be suspended for a six-month period beginning on the date of Executive's termination of employment and paid by Processing in a lump sum payment upon the earlier of (A) the first day of the seventh (7ᵗʰ) month following Executive's termination of employment or (B) the date of Executive's death, with any remaining payments occurring on their regularly scheduled payment dates. Any payments, including amounts suspended under Code Section 409A, made later than ten (10) days following the date of Executive's termination (or applicable due date under this Section 6) for whatever reason shall include interest at a reasonable money market rate, which shall begin accruing on the tenth (10ᵗʰ) day following the date of Executive's termination (or applicable due date under this Section 6).

(F)    If the Employment Period is terminated within two (2) years following a Change in Control, or if a Change in Control occurs before the payment of the full Severance Benefit has been made, any then remaining unpaid Severance Benefit shall be accelerated and be paid to Executive by Processing in a lump sum within ninety (90) days following the Change in Control.

7.    No Mitigation or Duty to Seek Reemployment.    Executive shall be under no duty or obligation to seek or accept other employment after termination and shall not be required to mitigate the amount of any payments provided for by this Agreement by seeking other employment or otherwise.    The Severance Benefit shall not be reduced or suspended if Executive accepts other employment.

8.    Survival.    Sections 6 through 22 (other than Sections 16 and 19) shall survive and continue in full force and effect in accordance with their terms notwithstanding the termination of the Employment Period.

9.    Severability.    If any one or more of the terms, provisions, promises, covenants or conditions of this Agreement or the application thereof to any person or circumstance shall be adjudged to any extent invalid, unenforceable, void or voidable for any reason whatsoever by a court of competent jurisdiction or an arbitration tribunal, such provision shall be as narrowly construed as possible, and each and all of the remaining terms, provisions, promises, covenants and conditions of this Agreement or their application to other persons or circumstances will not be affected thereby and shall be valid and enforceable to the fullest extent permitted by law.    To the extent this Agreement is in violation of any applicable laws, the parties shall negotiate in good faith to amend this Agreement, to the extent possible consistent with its purposes, to conform to applicable laws. None of the parties to this Agreement shall claim or assert illegality as a defense to the enforcement of this Agreement or any provision hereof.

10.    Complete Agreement.    This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

10

11.     **Enforcement.**  In the event any party to this Agreement resorts to legal action to enforce or interpret any provision of this Agreement, the prevailing party will be entitled to recover the costs and expenses of such action so incurred, including reasonable attorney's fees.

12.     **Effectiveness.**  The parties may execute this Agreement in separate counterparts, each of which shall be deemed an original and all of which together will constitute one and the same instrument.  To the extent signed and delivered by means of a facsimile machine or other electronic transmission (including transmission in portable document format by electronic mail), this Agreement shall be treated in all manners and respects and for all purposes as an original and shall have the same binding legal effect as if it were the original signed version thereof delivered in person.  None of the undersigned shall raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that such signature was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the enforceability of this Agreement and each of the undersigned forever waives any such defense.

13.     **Successors and Assigns.**  This Agreement will be binding upon and inure to the benefit of Chardan and each Company and any successor to any of them (to which this Agreement may be assigned, including without limitation any persons acquiring directly or indirectly all or substantially all of the business or assets of Chardan or either Company, whether by purchase, merger, consolidation, reorganization, or otherwise (and such successor shall thereafter be deemed Chardan or such Company, as the case may be, for the purposes of this Agreement).  This Agreement will inure to the benefit of and be enforceable by Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, and legatees, but otherwise will not otherwise be assignable, transferable or delegable by Executive.

14.     **Governing Law; Venue; Jurisdiction.**  This Agreement, and all matters arising under or related hereto, shall be governed according to the laws of the State of Florida, without respect to its conflict of law principles.  Each party hereby consents to the exclusive jurisdiction of the courts of the State of Florida and of the United States of America in the County of Broward for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby (and each party agrees not to commence any action, suits or proceeding relating thereto except in such courts).

15.     **Amendment of Agreement.**  This Agreement may not be modified or amended except by an instrument in writing signed by the parties hereto.  The parties agree that this Agreement may be amended to comply with applicable laws, including, but not limited to, Code Section 409A and Code Section 457A.

16.     **Insurance.**  The Companies may, at their discretion, apply for and procure in their own name and for their own benefit life and/or disability insurance on Executive in any amount or amounts considered advisable.  Executive agrees to cooperate in any medical or other examination, supply any information and execute and deliver any

11

applications or other instruments in writing as may be reasonably necessary to obtain and constitute such insurance.

17.     Executive's Cooperation.   During the Employment Period and thereafter, Executive shall cooperate with Chardan and each Company in any internal investigation or administrative, regulatory or judicial proceeding as reasonably requested by Chardan or a Company (including, without limitation, Executive being available to Chardan and each Company upon reasonable notice for interviews and factual investigations, appearing at the request of Chardan or either Company to give testimony without requiring service of a subpoena or other legal process, volunteering to Chardan or either Company all pertinent information and turning over to Chardan or either Company all relevant documents which are or may come into Executive's possession, all at times and on schedules that are reasonably consistent with Executive's other permitted activities and commitments).   In the event Chardan or either Company requires Executive's cooperation in accordance with this Section 17 after the end of the Employment Period, Chardan or such Company, as the case may be, shall pay Executive a per diem reasonably determined by the relevant Board and reimburse Executive for reasonable expenses incurred in connection therewith (including lodging and meals, upon submission of receipts).

18.     Code Section 409A and Code Section 457A.   It is intended that the payments under this Agreement shall be exempt from or in compliance with Code Section 409A and, to the extent applicable, Code Section 457A, and Chardan and each Company reserves the right to amend the terms of the Agreement if necessary either to extent the payments or comply with Section 409A and, to the extent applicable, Code Section 457A.   However, in no event shall the Companies or Chardan be responsible for any tax or penalty owed by Executive or Executive's spouse or beneficiary with regard to any benefit provided for under this Agreement.

19.     Tax Withholding.   Chardan and/or any Company may withhold amounts from any payments made to Executive under this Agreement to satisfy all applicable Federal, State, local or other income (including excise) and employment withholding taxes.   In the event Chardan and each Company fails to withhold such sums for any reason, or withholding is required for any non-cash payments provided in connection with any benefits paid to Executive pursuant to this Agreement, Chardan or any Company may require Executive to promptly remit to Chardan or a Company sufficient cash to satisfy all applicable income and employment withholding taxes.

20.     Excess Parachute Payments.   It is the intent of the parties hereto that no amount payable pursuant to the terms of this Agreement shall cause any payment or transfer by the Companies or Chardan for the benefit of Executive, whether paid or payable (or transferred or transferable) pursuant to the terms of this Agreement or otherwise (a "Payment"), to be subject to taxation under Code Section 4999 as an "excess parachute payment" as defined in Code Section 280G.   To the extent that it is determined that a Payment constitutes an "excess parachute payment," the Payment will be reduced to the highest amount permissible under Code Sections 280G and 4999 as necessary to prevent Executive from becoming subject to the excess parachute payment excise tax

12

under Code Section 4999 and as necessary to prevent the Companies or Chardan from losing all or part of its compensation deduction for such payment to the extent such deduction is applicable.

21.  **Construction.**

(a)  All references in this Agreement to "Sections" and "Exhibits" refer to the Sections and exhibits of this Agreement. The Section headings and titles appearing in this Agreement are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or extent of such Section or in any way affect this Agreement or the interpretation hereof.

(b)  All references to "$" or "dollars" will be to United States dollars and all references to "days" will be to calendar days unless otherwise specified.

(c)  As used in this Agreement, neutral pronouns and any variations thereof shall be deemed to include the feminine and masculine and all terms used in the singular shall be deemed to include the plural, and vice versa, as the context may require.

(d)  The words "hereof", "herein" and "hereunder" and other words of similar import refer to this Agreement as a whole, as the same may from time to time be amended or supplemented, and not to any subdivision contained in this Agreement.

(e)  The word "including" when used herein is not intended to be exclusive and means "including, but not limited to." The word "or" when used herein is not intended to be exclusive unless the context clearly requires otherwise.

(f)  The exhibits hereto will be deemed to be incorporated in and an integral part of this Agreement.

(g)  All provisions of this Agreement have been mutually negotiated and drafted. The provisions of this Agreement will be interpreted and construed in accordance with their fair meanings, and not strictly for or against any party, regardless of which party may have drafted this Agreement or any specific provision.

22.  **Directors' and Officers' Insurance.**  During the Employment Period and for six (6) years thereafter, Chardan and each Company agrees to maintain directors' and officers' insurance covering Executive on the same terms as it maintains such insurance for the benefit of any other director or officer (or any former director or officer) of Chardan or either Company.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

[SIGNATURE PAGE FOLLOWS]

13

DAL GROUP, LLC

By: FLATWORLD DAL LLC, its Member

By: NAGINA, ENGINEERING INVESTMENT
CORP., its Member

By: _____
Raj K. Gupta
President

DJS PROCESSING, LLC

By: _____
David J. Stern
President

CHARDAN 2008 CHINA ACQUISITION CORP.

By: _____
Kerry Propper
Chief Executive Officer

DAVID J. STERN

14

DAL GROUP, LLC

By: FLATWORLD DAL LLC, its Member

By: NAGINA ENGINEERING INVESTMENT
CORP., its Member

By: _____
Raj K. Gupta
President

DJS PROCESSING LLC

By: _____
David J. Stern
President

CHARDAN 2008 CHINA ACQUISITION CORP.

By: _____
Kerry Propper
Chief Executive Officer

_____
DAVID J. STERN

14

DAL GROUP, LLC

By: FLATWORLD DAL, LLC, its Member

By: NAGINA ENGINEERING INVESTMENT
    CORP., its Member

By: _____
    Raj K. Gupta
    President

DJS PROCESSING, LLC

By: _____
    David J. Stern
    President

CHARDAN 2008 CHINA ACQUISITION CORP.

By: _____
    Kerry Propper
    Chief Executive Officer

_____
DAVID J. STERN

**EXHIBIT I**

[date]

Dear Mr. Stern:

This letter will confirm the agreement between you and Chardan 2008 China Acquisition Corp. ("Chardan"), DAL Group, LLC ("DAL"), DJS Processing LLC ("Processing") and their Affiliates, (each a "Company" and collectively referred to herein as the "Companies") as follows:

1.   Separation from the Company.

By signing this letter agreement you acknowledge that the termination of your employment with the Company will be effective on ____ (the "Separation Date"). As of the Separation Date, you will cease to be an employee of any Company, and you will no longer be required to fulfill any of the duties and responsibilities associated with your positions. In addition, your Employment Agreement dated January 15, 2010 among you, Chardan, Processing and DAL (the "Employment Agreement") will terminate as of the Separation Date, except as otherwise provided therein. You further agree that, as of the later of the Separation Date or the end of the Initial Period (as defined in the Voting Agreement dated January 15, 2010 between Chardan, officers and you), you hereby resign from any position on any Board (as defined in the Employment Agreement) of the Companies.

2.   Severance Benefits.

In exchange for your execution of this letter agreement, including the Release in Section 3 and your continued compliance that certain Confidentiality and Noncompetition Agreement dated as of January 15, 2010 between you and the Companies (the "Confidentiality Agreement"), the Companies agrees to provide you with the "Severance Benefits" as defined in Section 6(a) of the Employment Agreement. Such Severance Benefits will not be provided until this letter agreement becomes effective and enforceable, and, subject to such condition, such Severance Benefits shall be payable no later than the time frames set forth in Section 6(a) of the Employment Agreement. Such Severance Benefits shall not be considered compensation for purposes of any employee benefit plan, program, policy or arrangement maintained or hereafter established by the Company or any of its Affiliates. You understand that the Severance Benefits provided to you represent consideration for signing this letter agreement and are not salary, wages or benefits to which you were already entitled. You also acknowledge and represent that you have already received everything (including, without limitation, all compensation, benefits and any other form of remuneration of any kind) to which you were entitled by virtue of your employment relationship with each Company through the Separation Date.

Ex. I - 1

3.   Release by You.

(a)   Your (for yourself, your heirs, assigns, or executors) release and forever discharge each Company, its Affiliates (as defined below), successor and assigns, and each of their respective directors, officers, members, agents, shareholders, employees, and representatives (collectively, the "Company Entities") from any and all claims, demands, causes of action, contracts, covenants, obligations, debts, costs, expenses, attorneys' fees, liabilities of whatever kind or nature, in law or equity, by statute or otherwise, whether now known or unknown, vested or contingent, suspected or unsuspected, and whether or now concealed or hidden, which have existed or may have existed, or which do or exist through the date this letter agreement becomes effective, and enforceable, ("Claims") of any kind, including, without limitation those Claims which relate in any way to your employment with any Company or the termination of that employment, except those arising out of (i) the performance of this letter agreement, (ii) your rights under the employee benefit plans of any Company, (iii) your rights to accrued, unused vacation and PTO, (iv) your right to any indemnification by any Company pursuant to its articles of incorporation, bylaws, operating agreement or limited liability company agreement, (v) your rights to coverage under any Company's director's and officers' insurance policy, (vi) your rights as a shareholder or member of any Company (to the extent you continue to own capital shares or membership interests in any Company), following the execution of this Agreement), and (vii) your rights with respect to stock options or other similar equity-based incentives granted to you by any Company, as determined under the applicable plans and award agreements (to the extent such rights survive a termination of employment). Such released claims include, without in any way limiting the generality of the foregoing, any and all Claims of employment discrimination under any local, state, or federal law, including, without limitation, Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act ("ADEA"), as amended (which prohibits discrimination in employment based on age), Older Workers Benefit Protection Act of 1990 ("OWBPA") (which also prohibits discrimination in employment based on age).

(b)   In signing this letter agreement you acknowledge that you intend that it shall be effective as a bar to each and every one of the Claims hereinabove mentioned or implied. You expressly consent that this letter agreement shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown, unsuspected Claims (notwithstanding any state statute that expressly limits the effectiveness of a general release of unknown, unsuspected and unanticipated Claims), if any, as well as those relating to any other Claims hereinabove mentioned or implied. You acknowledge and agree that this waiver is an essential and material term of this letter agreement and without such waiver the Companies would not have provided the Severance Benefits described in Section 2. You further agree that in the event you bring your own Claim in which you seek damages against any Company, or in the event you seek to recover against any Company in any Claim brought by a governmental agency on your behalf, this release shall serve as a complete defense to such Claims.

(c)   By signing this letter agreement, you acknowledge that your

Ex. 1-2

(i)   have been given twenty-one days after receipt of this letter agreement within which to consider it;

(ii)   have carefully read and fully understand all of the provisions of this letter agreement;

(iii)   knowingly and voluntarily agree to all of the terms set forth in this letter agreement;

(iv)   knowingly and voluntarily agree to be legally bound by this letter agreement;

(v)   have been advised and encouraged in writing (via this letter agreement) to consult with an attorney prior to signing this letter agreement; and

(vi)   understand that this letter agreement, including the Release, shall not become effective and enforceable until the eighth day following execution of this letter agreement, and that at any time prior to the effective day you can revoke this letter agreement by delivering written notice of such revocation to _____ no later than the seventh day after your execution of this letter agreement.

4.   No Pending Lawsuits and No Assignment of Claims.   You represent and warrant that you have not filed any Claim, lawsuit or charge against any of the Company Entities that will not be discharged as a result of this letter agreement, except as otherwise provided in Section 4(a) of this letter agreement. You hereby promise never to file a lawsuit asserting any Claims that you have released in Paragraph 3, above. In addition, to the extent any such proceeding or charge may be brought by anyone (including the EEOC), you expressly waive any Claim to any form of monetary or other damages, or any other form of recovery or relief in connection with any such action. You further represent and warrant that you have not heretofore assigned or transferred, or purported to assign or transfer, to any person, firm, corporation or entity any Claim or other matter herein released by you. Notwithstanding the foregoing, nothing herein shall prohibit you from challenging the validity of the ADEA waiver herein; however, in the event you unsuccessfully do so, you may be held liable for the Company Entities' attorney's fees and costs to the same extent that successful defendants are allowed attorney's fees under the ADEA and/or OWBPA.

5.   Consequences of Your Violation of Promises.   If you breach this letter agreement including, but not limited to, by filing, bringing or participating in any Claims or actions contrary to your agreements and representations made herein, including, but not limited to, those in paragraphs 3 and 5 above, in addition to any other rights and remedies the Companies may have, (i) you will immediately repay to the Companies all amounts received by you hereunder, (ii) you shall forfeit all rights to any and all future payments and benefits, if any, to be provided under this letter agreement; and (iii) you agree to pay all costs and expenses, including reasonable attorneys' fees, incurred by the Companies or any of the Company Entities

Ex. 1 - 3

in defending against such Claims or actions brought by you or on your behalf or in enforcing the terms of this letter agreement. The preceding sentence shall not apply to any Claims that you file under ADRA or OWBPA or any challenge that you make to the validity of the ADEA or OWBPA waiver contained in this letter agreement. In the event you unsuccessfully challenge the validity of the ADEA or OWBPA waiver herein, you may be held liable for the Companies' attorneys' fees and costs to the same extent that successful defendants are allowed attorneys' fees under the ADEA and/or OWBPA.

6. **Non-Disparagement.** You agree not to make, or cause to be made, any disparaging, negative or adverse remarks whatsoever, whether in public or private, and whether written, oral or otherwise, concerning any of the Company Entities or their respective businesses, products or services. This paragraph does not apply to factual statements made in connection with legal proceedings, governmental and regulatory investigations and actions, and internal Company investigations or any other statement or disclosure required by law.

7. **Affiliates.** An "Affiliate" of a Person is a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person. "Person" includes a natural person, a trust or estate, a Company, partnership, limited liability company, or other legal entity.

8. **Code Section 409A and Code Section 457A.** It is intended that the payments under this letter agreement shall be exempt from, or in compliance with, Code Section 409A and, to the extent applicable, Code Section 457A, and the Company reserves the right to amend the terms of this letter agreement if necessary either to exempt the payments or comply with Code Section 409A and, to the extent applicable, Code Section 457A. However, in no event shall the Companies be responsible for any tax or penalty owed by Executive or Executive's Spouse or beneficiary, with regard to any benefit provided for under the Employment Agreement.

9. **Additional Agreements.** You further agree that as of the date hereof, you have returned to each Company any and all property, tangible or intangible, relating to its business, which you possessed or had control over at any time (including, but not limited to, company-provided credit cards, building or office access cards, keys, computer equipment, manuals, files, documents, records, software, customer data bases and other data) and that your shall not retain any copies, compilations, extracts, excerpts, summaries or other notes of any such manuals, files, documents, records, software, customer data bases or other data.

10. **Confidentiality of this Letter Agreement.** The contents of this letter agreement, including but not limited to its financial terms, are strictly confidential. By signing this letter agreement, you agree and represent that you will maintain the confidential nature of this letter agreement, except (a) to legal counsel, tax and financial planners, and immediate family who agree to keep it confidential, (b) as otherwise required by law, in which case you shall notify Processing in writing in advance of disclosure, and (c) as necessary to enforce this letter agreement.

11. **No Transfer or Assignment.** You and the Companies agree that no interest or right you have or any of your beneficiaries has to receive payment or to receive benefits under

this letter agreement shall be subject in any manner to sale, transfer, assignment, pledge, attachment, garnishment, or other alienation or encumbrance of any kind, except as required by law. Nor may such interest or right to receive payment or distribution be taken, voluntarily or involuntarily, for the satisfaction of the obligations or debts of, or other claims against you or your beneficiary, including for alimony, except to the extent required by law.

12.  **No Admissions.** This letter agreement shall not be construed as an admission of any wrongdoing by any Company, or its directors, officers, agents and employees.

13.  **Complete Agreement.** This letter agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way. Notwithstanding anything to the contrary contained herein, you acknowledge and agree that you remain bound by that certain Confidentiality Agreement.

14.  **Amendment of Agreement.** This letter agreement may not be modified or amended except by an instrument in writing signed by the parties hereto. The parties agree that this Agreement may be amended to comply with applicable laws, including but not limited to, Code Section 409A.

15.  **Governing Law; Venue; Jurisdiction.** This letter agreement, and all matters arising and/or related hereto, shall be governed according to the laws of the State of Florida, without respect to its conflict of laws principles. Each party hereby consents to the exclusive jurisdiction of the courts of the State of Florida and of the United States of America in the County of Broward for any actions, suits or proceedings arising out of or relating to this letter agreement and the transactions contemplated hereby (and each party agrees not to commence any action, suits or proceeding relating thereto except in such courts).

16.  **Severability.** If any one or more of the terms, provisions, promises, covenants or conditions of this letter agreement or the application thereof to any person or circumstance will be adjudged to any extent invalid, unenforceable, void or voidable for any reason whatsoever by a court of competent jurisdiction or an arbitration tribunal, such provision will be as narrowly construed as possible, and each and all of the remaining terms, provisions, promises, covenants and conditions of this letter agreement or their application to other persons or circumstances will not be affected thereby and will be valid and enforceable to the fullest extent permitted by law. To the extent this letter agreement is in violation of any applicable laws, the parties shall negotiate in good faith to amend this letter agreement, to the extent possible consistent with its purposes, to conform to applicable laws. Neither party shall claim or assert illegality as a defense to the enforcement of this letter agreement or any provision hereof.

17.  **Effectiveness.** The parties may execute this letter agreement in separate counterparts, each of which shall be deemed an original and all of which together will constitute one and the same instrument. To the extent signed and delivered by means of a facsimile machine or other electronic transmission (including transmission in portable document format or by electronic mail), this letter agreement shall be treated in all manners and respects and for all purposes as an original and shall have the same binding legal effect as if it were the original

Ex. 1 - 5

signed version thereof delivered in person. None of the parties shall raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that such signature was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the enforceability of this letter agreement and each of the parties forever waives any such defense.

Please indicate your agreement by signing this letter and returning it to us on or before _____

Very truly yours,

CHARDAN 2008 CHINA ACQUISITION CORP.

By: _____

Its: _____

DAL GROUP, LLC

By: _____

Its: _____

DJS PROCESSING, LLC

By: _____

Its: _____

AGREED TO AND ACCEPTED BY:

_____

David J. Stern

Dated: _____

Ex. 1 - 6

BARD1\0253832.04
IDG\AC - 105780/0001

IN THE CIRCUIT COURT FOR THE 17TH JUDICIAL CIRCUIT IN AND
FOR
BROWARD COUNTY, FLORIDA

DJSP ENTERPRISES, INC. f/k/a
CHARDAN CHINA ACQUISITION
CORP., DAL GROUP, LLC, and
DJS PROCESSING, LLC,

     Plaintiffs,

vs.

DAVID J. STERN, LAW OFFICES OF
DAVID J. STERN, P.A., STERN HOLDING
COMPANY-DS, INC. f/k/a DEFAULT
SERVICING, INC., STERN HOLDING
COMPANY-PT, INC. f/k/a PROFESSIONAL
TITLE AND ABSTRACT COMPANY OF
FLORIDA, INC., and P&M CORPORATE
FINANCE, LLC,

     Defendants.

CASE NO: 12-96 CACE (07)

JUDGE: JACK TUTER

_____/

DJSP ENTERPRISES, INC. f/k/a
(07)
CHARDAN CHINA ACQUISITION
CORP.,

     Plaintiffs,

vs.

McGLANDREY & PULLEN, LLP and
GRANT THORNTON, LLP,

     Defendants.

CASE NO: 12-000097 CACE



EXHIBIT
C

CASE NO: 12-000096 CACE (07)

## FINAL ORDER ON DEFENDANT P&M CORPORATE FINANCE, LLC'S MOTION FOR SUMMARY FINAL JUDGMENT ON ALL CLAIMS

THIS CAUSE came before the court on Defendant P&M Corporate Finance, LLC's Motion for Summary Final Judgment on all claims. The court having considered the motion and responses, summary judgment evidence, having heard arguments of counsel, and being otherwise duly advised in the premises, finds and decides as follows:

In its most simplistic form, this highly technical and complicated business transaction boils down to language restricting representations entered into by the parties at the inception of the deal. Years later, Plaintiff, as beneficiary of the short end of the transaction, now seeks to avoid and disclaim the plain meaning of those representations. Sophisticated buyers and sellers entering into such transactions should know the Court's role in such matters is to enforce the plain meaning of their agreements.

This action arises from the alleged fraudulent misrepresentations and omissions made by Defendants David J. Stern ("Stern"), Stern Holding Company-DS, Inc. f/k/a Default Servicing, Inc. ("DSI"), Stern Holding Company-PT, Inc. f/k/a Professional Title and Abstract Company of Florida, Inc. ("PTA"), and the Law Offices of David J. Stern, P.A. ("LODJS") (collectively the "Seller Defendants"). Plaintiff alleges Defendant P&M Corporate Finance, LLC ("PMCF") committed intentional misconduct in creating a revenue recognition policy and financial pro

2

CASE NO: 12-000096 CACE (07)

forma model that was used to value the non-legal processing division of LODJS and to convert LODJS' cash-basis reporting into accrual financial statements in violation of generally accepted accounting principles.

On February 19, 2014, Plaintiffs DJSP Enterprises, Inc., DAL Group, LLC, and DJS Processing, LLC, filed their ten-count fourth amended complaint against Defendants. On June 10, 2014, pursuant to a confidential settlement agreement, the court entered a final order of dismissal with prejudice as to the seller Defendants. On November 14, 2014, Defendant PMCF filed four separate motions for summary judgment.[1] On November 17, 2014, Defendant PMCF filed its corrected brief in Support of P&M Corporate Finance, LLC's Motion for Summary Final Judgment. On December 26, 2014, Plaintiff DJSP ("Plaintiff") filed its consolidated opposition to Defendant PMCF's first, second, third, and fourth motions for summary final judgment. On December 31, 2014, Defendant PMCF filed its reply in support of the instant first motion for summary judgment on all claims. A hearing was held before the court on January 7, 2015.

Summary judgment is appropriate "if the pleadings and summary judgment evidence on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fla. R. Civ. P. 1.510(c). The party moving for summary judgment has the burden of showing the absence of

---

[1] Defendant PMCF's Fourth Motion for Summary Judgment on Counterclaims will be addressed by separate order.

3

a genuine issue of fact. The court must accept the Plaintiff's allegations as true for purposes of the instant motion. *Graff v. McNeil*, 322 So. 2d 40, 42 (Fla. 1st DCA 1975). All inferences must be drawn from the proof in favor of the party opposing the motion. *See Liberty Mut. Ins. Co. v. Stuckey*, 220 So. 2d 421 (Fla. 4th DCA 1969).

When the moving party shows that no material fact on any issue is disputed, the burden shifts to the non-moving party to demonstrate that a material fact is in dispute. *Landers v. Milton*, 370 So. 2d 368, 370 (Fla. 1979). If the party opposing summary judgment cannot show the existence of a genuine issue of material fact, then the moving party should be entitled to judgment as a matter of law. *Congress Park Office Condos II, LLC v. First-Citizens Bank & Trust Co.*, 105 So. 3d 602, 606 (Fla. 4th DCA 2013).

A recitation of the material facts is necessary to understand the complexities of the instant litigation. As stated above, Plaintiff participated in the purchase of the non-legal operations of LODJS. The summary judgment evidence reveals that in June 2007, prior to the purchase, LODJS engaged Defendant PMCF to provide investment banking services in connection with the sale. In exchange for its investment banking services, Plaintiff agreed to compensate Defendant PMCF 1.5% of the purchase price for LODJS' assets. Plaintiff's claims of negligence and fraud concern PMCF's role in creating a revenue recognition policy, a revenue recognition

4

CASE NO: 12-000096 CACE (07)

model, and financial statements for 2008 for the non-legal operations ("2008 Financial Statements") of LODJS. In support of its motion, Defendant PMCF argues that the parties, all highly sophisticated and experienced business people who were represented by competent counsel, entered into a series of written agreements that preclude Defendant PMCF's liability.

Prior to the transaction, Plaintiff was known as Chardan 2008 China Acquisition Corp. ("Chardan"). Plaintiff was formed as a special purpose acquisition company "for the purpose of acquiring, engaging in a merger ... purchasing all or substantially all of the assets of ... an unidentified operating business." (Chardan Prospectus, cover page). Plaintiff's management had the responsibility to "source business transactions, evaluate their merits, conduct or monitor diligence, and conduct negotiations." (Chardan Prospectus, pg. 38). Kerry Propper ("Propper") served as the chief executive officer of Chardan. Propper admitted in his deposition that he was a sophisticated investor. (K. Propper Dep. 2/20/14 at pg. 317 – 318).

In January 2009, a New York investment banking firm that had been engaged with FlatWorld Capital LLC ("FlatWorld")[2], contacted Plaintiff about participating in the purchase of LODJS' non-legal operations. On April 30, 2009, Plaintiff entered into a non-disclosure agreement ("NDA") with LODJS, and its related companies.

---

[2] FlatWorld is a private equity investment firm and non-party to the instant action.

CASE NO: 12-000096 CACE (07)

to obtain business information about LODJS' non-legal operations.  Paragraph 3 of

the NDA provides, in pertinent part:

> ...you understand that **neither the Companies nor any of
> its Representatives have made or make any
> representation or warranty as to the accuracy or
> completeness of the Evaluation Material**. ... The only
> information that will have any legal effect will be that
> specifically represented in a definitive purchase agreement
> or the binding provisions of an executed letter of intent; *in
> no event will the Companies nor its Representatives have
> any liability to you or any of your affiliates or
> Representatives resulting from the use of the Evaluation
> Material other than specifically represented in a
> definitive purchase agreement.*

(NDA at ¶ 3) (emphasis added). The NDA defines representatives as "directors,

officers, employees, agents or advisors."  (NDA at ¶ 1(a)(2)).  The summary

judgment evidence reveals that Defendant PMCF is an advisor, and that the 2008

financial statements qualify as evaluation material, as contemplated by the NDA.

Thereafter, on June 9, 2009, Plaintiff entered into a letter of intent with LODJS

and FlatWorld. McGladrey & Pullen, LLP ("McGladrey") was retained to audit the

financial statement for the non-legal operations, including auditing the 2008

Financial Statements, prepared by Defendant PMCF. On December 10, 2009,

Plaintiff entered into the Master Acquisition Agreement ("MAA"), which contained

the terms of the agreement regarding the purchase of LODJS' non-legal operations.

The MAA contains no representation or warranty by Defendant PMCF, only those

6

CASE NO: 12-000096 CACE (07)

of the Seller Defendants. (MAA, § 4.2). Specifically, section 4.2 of the MAA describes that the seller defendants warrant and represent that the audited financial statements being provided with the agreement were prepared in accordance with generally accepted accounting principles and fairly presented the results of the non-legal operations. Section 4.24 of the MAA provides, in pertinent part:

> Except as expressly set forth herein, **no Person has been authorized by Sellers, the Newly-Formed LLCs or Seller Controlling Party to make any representation or warranty relating to Sellers**, and Newly-Formed LLC, the Seller Controlling Party or the Target Business or otherwise in connection with the Transactions contemplated by this Agreement or the Transaction Documents, and **if made, such representation or warranty may not be relied upon as having been authorized by Sellers**.

(MAA at § 4.24(a).

Under Florida law, "[c]ontracts are voluntary undertakings, and contracting parties are free to bargain for—and specify—the terms and conditions of their agreement." *Okeechobee Resorts, L.L.C. v. E Z Cash Pawn. Inc.*, 145 So. 3d 989, 993 (Fla. 4th DCA 2014). Therefore, "it is a court's duty to enforce the contract as plainly written." *Id.* (*citing Rybovich Boat Works, Inc. v. Atkins*, 587 So.2d 519, 521–22 (Fla. 4th DCA 1991) (reversing trial court's refusal to give effect to an unambiguous "anti-waiver" clause contained in the parties' written contract)). Thus, based on the plain and unambiguous language of the MAA, the court determines that

section 4.24 expressly *disclaims any representation* made by any person *other than the Sellers, the Newly-Formed LLCs or Seller Controlling Party*. It is clear these sophisticated parties agreed that non-parties and third-parties to the contract, including Defendant PMCF, would have no liability thereunder and, further, that any representations made in the MAA were that of the Seller and not of any of its representatives.

There is no genuine issue of material fact that the parties involved in the instant action are savvy and sophisticated investment companies. While there is no Florida case that directly addresses the action at bar, other Florida courts have determined that sophisticated purchasers of commercial property do not have a cause of action for fraud where the purchaser "ha[s] ample opportunity to conduct inspections, and could have discovered an alleged defect through the exercise of ordinary diligence." *Agrobin, Inc. v. Botanica Dev. Assocs.*, 861 So. 2d 445, 446 (Fla. 3d DCA 2003) (*quoting Wasser v. Sasoni*, 652 So. 2d 411 (Fla. 3d DCA 1995)).

In the instant action, the Plaintiff was represented by experienced counsel. The Plaintiff's Chief Executive officer Kerry Propper testified in deposition that it was Plaintiff's management's responsibility to understand all the terms of any agreement it entered into on behalf of the Plaintiff. Further, Propper testified that the Plaintiff knowingly entered into the "no-liability" agreement of the NDA, and intended to be bound by that agreement. Additionally, the summary judgment

8

evidence reveals Plaintiff retained McGladrey LLP a national accounting firm, to audit financial statements connected with the transaction, including the 2008 financial statements. After concluding the audit, in September 2009, McGladrey provided the audited financial statements to Plaintiff. In turn, the Plaintiff relied on McGladrey's audit in deciding to proceed with the transaction.

The crux of Plaintiff's action against Defendant PMCF is that Defendant PMCF made material misrepresentations in the 2008 financial statements. Defendant PMCF moves for summary judgment on the basis of the no-liability clause of the NDA. The court determines, that although not expressly named in the contract, Defendant PMCF is an intended third-party beneficiary of the NDA and MAA. *See Esposito v. True Color Enterprises Const., Inc.*, 45 So. 3d 554, 555 (Fla. 4th DCA 2010) ("A party is an intended beneficiary only if [both] parties to the contract clearly express ... an intent to primarily and directly benefit the third party or a class of persons to which that party claims to belong."). Thus, Defendant PMCF can claim the protection of both the NDA and MAA. *Id.* at 555.

The court agrees the parties must honor the benefit bargained for in their contract. *See In re IBP, Inc. Shareholders Litig.*, 789 A.2d 14, 72-73 (Del. Ch. 2001) (upholding a merger agreement and noting that the "negotiations between IBP and Tyson did not take place between a world-wise, globe-trotting capitalist with an army of advisors on one side, and Jethro Bodine, on the other [, but rather that] two

9

equally sophisticated parties dealt with each other at arms' length with the aid of expensive and highly skilled advisors"); *see also, Great Lakes Chemical Corp. v. Pharmacia*, 788 A.2d 544, 555 (Del. Ch. 2001) (dismissing fraud claim because the parties were "highly sophisticated ..., assisted by industry consultants and experienced legal counsel, [who] entered into carefully negotiated disclaimer language after months of extensive due diligence" and "explicitly allocated their risks and obligations in the purchase agreement").

The result is no different in the instant action. The court determines that Plaintiff knowingly agreed on how to allocate the risks of the purchase of the non-legal operations, including those risks associated with the financial statements. In the NDA, the parties explicitly agreed that advisors, including Defendant PMCF, would not have any liability with respect to the information they prepared, except as provided for in a definitive purchase agreement, the MAA. The court further determines that the parties then allocated the risk associated with the financial statements in the MAA through the drafting of section 4.2, which placed the representations as those of the Sellers and not of Defendant PMCF.

In fact, Plaintiff's expert testified that financial statements are "the responsibility of a company's management." (10/13/2014 Sondhi Dep. at p. 183 – 184). Further, Plaintiff's expert testified that "[u]ltimately, the company has to claim responsibility for [the revenue recognition policy issued by the company]." (Id. at p.

10

CASE NO: 12-000096 CACE (07)

185). Therefore, based on the sophistication of the parties, the unambiguous language in the contract, and existing legal precedent, the court determines the no-liability provision is fully enforceable and applicable.

Accordingly, it is hereby:

**ORDERED** that Defendant P&M Corporate Finance, LLC's Motion for Summary Final Judgment on all claims is **GRANTED.** Final judgment shall be entered in favor of Defendant PMCF on all counts. The court reserves jurisdiction to award attorney's fees and costs, if applicable. The Defendants shall provide the court a proposed final judgment within (10) days of this order.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 3ʳᵈ day of February, 2015.

_____

**JACK TUTER
CIRCUIT COURT JUDGE**

11

CASE NO: 12-000096 CACE (07)

Copies to:

Craig J. Trigoboff, Esq., Waldman Trigoboff Hildebrandt Marx & Calnan, P.A., Broward Financial Centre, Suite 1700, 500 East Broward Blvd., Fort Lauderdale, FL 33394
email: ctrigoboff@waldmanlawfirm.com

Glenn J. Waldman, Esq., Waldman Trigoboff Hildebrandt Marx & Calnan, P.A., Broward Financial Centre, Suite 1700, 500 East Broward Blvd., Fort Lauderdale, FL 33394
email: gwaldman@waldmanlawfirm.com

Michael P. Hindelang, Esq., Honigman Miller Schwartz and Cohn LLP, 2290 First National Building, 660 Woodward Ave., Detroit, MI 48226
email: mhindelang@honigman.com

Raymond W. Henney, Esq., Honigman Miller Schwartz and Cohn LLP, 2290 First National Building, 660 Woodward Ave., Detroit, MI 48226
email: rhenney@honigman.com

Syed Ahmadul Huda, Esq., Honigman Miller Schwartz and Cohn LLP, 2290 First National Building, 660 Woodward Ave., Detroit, MI 48226
email: ahuda@honigman.com

Robert M. Einhorn, Esq., Zarco Einhorn Salkowski & Brito, P.A., 100 Southeast Second St., Suite 2700, Miami Tower, Miami, FL 33131
email: reinhorn@zarcolaw.com

Robert Zarco, Esq., Zarco Einhorn Salkowski & Brito, P.A., 100 Southeast Second St., Suite 2700, Miami Tower, Miami, FL 33131
email: rzarco@zarcolaw.com

12

IN THE CIRCUIT COURT FOR THE 17TH JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

DJSP ENTERPRISES, INC. f/k/a
CHARDAN CHINA ACQUISITION
CORP., DAL GROUP, LLC, and
DJS PROCESSING, LLC,

       Plaintiffs,

vs.

DAVID J. STERN, LAW OFFICES OF
DAVID J. STERN, P.A., STERN HOLDING
COMPANY-DS, INC. f/k/a DEFAULT
SERVICING, INC., STERN HOLDING
COMPANY-PT, INC. f/k/a PROFESSIONAL
TITLE AND ABSTRACT COMPANY OF
FLORIDA, INC., and P&M CORPORATE
FINANCE, LLC,

       Defendants.

_____/

CASE NO:  12-000096 CACE (07)

JUDGE: JACK TUTER

CASES CONSOLIDATED
FOR PURPOSES OF DISCOVERY

DJSP ENTERPRISES, INC. f/k/a
CHARDAN CHINA ACQUISITION
CORP.,

       Plaintiffs,

vs.

McGLANDREY & PULLEN, LLP and
GRANT THORNTON, LLP,

       Defendants.

_____/

CASE NO: 12-000097 CACE (07)

### FINAL JUDGMENT FOR DEFENDANT P & M CORPORATE FINANCE, LLC.

    Pursuant to the Court's entry of summary judgment on all claims in favor of P & M

Corporate Finance, LLC:

CASE NO: 12-000096 CACE (07)

**IT IS ADJUDGED** that Plaintiff's take nothing from this action and that Defendant P & M Corporate Finance, LLC recover costs and or attorney fees, as may be permitted by law, from Plaintiff's for which sum let execution issue. The Court reserves jurisdiction to award costs or attorney fees at a later date, and further, this Final Judgment in favor of P & M Corporate Finance, LLC, shall not affect any pending counterclaims.

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 2nd day of March, 2015.

_____
JACK TUTER
CIRCUIT COURT JUDGE

Copies to:

Craig J. Trigoboff, Esq., Waldman Trigoboff Hildebrandt Marx & Calnan, P.A., Broward Financial Centre, Suite 1700, 500 East Broward Blvd., Fort Lauderdale, FL 33394
email: ctrigoboff@waldmanlawfirm.com

Glenn J. Waldman, Esq., Waldman Trigoboff Hildebrandt Marx & Calnan, P.A., Broward Financial Centre, Suite 1700, 500 East Broward Blvd., Fort Lauderdale, FL 33394
email: gwaldman@waldmanlawfirm.com

Michael P. Hindelang, Esq., Honigman Miller Schwartz and Cohn LLP, 2290 First National Building, 660 Woodward Ave., Detroit, MI 48226
email: mhindelang@honigman.com

Raymond W. Henney, Esq., Honigman Miller Schwartz and Cohn LLP, 2290 First National Building, 660 Woodward Ave., Detroit, MI 48226
email: rhenney@honigman.com

Syed Ahmadul Huda, Esq., Honigman Miller Schwartz and Cohn LLP, 2290 First National Building, 660 Woodward Ave., Detroit, MI 48226
email: ahuda@honigman.com

Robert M. Einhorn, Esq., Zarco Einhorn Salkowski & Brito, P.A., 100 Southeast Second St., Suite 2700, Miami Tower, Miami, FL 33131
email: reinhorn@zarcolaw.com

Robert Zarco, Esq., Zarco Einhorn Salkowski & Brito, P.A., 100 Southeast Second St., Suite 2700, Miami Tower, Miami, FL 33131
email: rzarco@zarcolaw.com

2

# WALDMAN TRIGOBOFF
## HIDEBRANDT MARX & CALNAN, P.A.
### ATTORNEYS AT LAW

2200 NORTH COMMERCE PARKWAY • SUITE 202 • WESTON, FLORIDA 33326
TELEPHONE (954) 467-8800 • FACSIMILE (954) 467-6222

April 19, 2012

D. David Keller, Esq.
Keller Landsberg, P.A.
Broward Financial Centre•Suite 1400
500 East Broward Boulevard
Fort Lauderdale, FL 33394

Re:  DJSP Enterprises, Inc., *et al.* vs.  David J. Stern, *et al.*;
     Broward County Circuit Court; Case No.: 12-00096 (19)

Dear David:

As you know, we represent P&M Corporate Finance, LLC ("PMCF") in this matter.

Certain notifications are required under in the Agreement between PMCF and David J. Stern, P.A., dated June 11, 2007 (the "Agreement").  Because of that obligation, we send this letter to notify your client that PMCF is preserving its rights under the indemnity provision of the Agreement (Section 8).  Due to the allegations of the complaint and the claims asserted by the plaintiffs, it is necessary under Section 8(b) for PMCF to have retained separate counsel.

We trust that this letter is sufficient to satisfy the notice requirement under paragraph 9 of the Agreement.  Kindly advise us if you disagree. If you have any questions, please feel free to contact me.

Very truly yours,



Glenn J. Waldman

GJW/mw

cc:   Raymond W. Henney, Esq.

EXHIBIT



April 24, 2012

*Via Email: gwaldman@waldmanlawfirm.com*
Glenn J. Waldman, Esq.
Waldman Trigoboff, et al.
2200 North Commerce Parkway, Suite 202
Weston, FL 33326

      Re:    DJSP Enterprises, Inc., etc., et al. v. David J. Stern, et al.
              Broward County Circuit Court Case No.: 12-00096
              Our File: S347/72-004

Dear Glenn:

      This will acknowledge receipt of your letter dated April 19, 2012 regarding the notification pursuant to the agreement between your client P & M Corporate Finance, LLC and David J. Stern, P.A. dated June 11, 2007. I have transmitted your letter to our client and will respond further once we have had an opportunity to discuss it.

      Please let me know if you have any questions.

                    Very truly yours,

                    */s/ D. David Keller*
                    D. David Keller

DDK:lgk



EXHIBIT
E

{00124768.1}

Broward Financial Centre, 500 E. Broward Boulevard, Suite 1400, Fort Lauderdale, FL 33394
P: 954.761.3550 | F: 954.525.2134 | www.kellerlandsberg.com



**KELLER LANDSBERG**
*Professional Association*

May 1, 2013

*Via Email*
Glenn J. Waldman, Esquire
Waldman Trigoboff, *et al.*
2200 North Commerce Parkway, Suite 202
Weston, FL 33326

      Re:    DJSP Enterprises, Inc., *etc., et al.* v. David J. Stern, *et al.*
              Case No.:    12-00096 19 (Broward County Circuit Court)
              Our File No.:  S347/72-004

Dear Glenn:

    This is in further response to your April 19, 2012 letter regarding your client's notification of a claim of indemnify under the June 11, 2007 agreement between P&M Corporate Finance, LLC and David J. Stern, P.A. ("Agreement.") We acknowledge receipt of your letter but disagree with your interpretation of the indemnity provision of the Agreement. Specifically, David J. Stern, P.A. disagrees that P&M Corporate Finance, LLC has any right to indemnity under the terms of the Agreement for the claim made against it in the above-referenced case.

    Please let us know if you have any questions.

                             Very truly yours,

                             Raymond L. Robin

RLR

cc:    David J. Stern, Esq. *(Via email)*



EXHIBIT
F